ALINE BLANCHON and CHARLES F. BARTHOLO-MEES, Executors of the last will and testament of JOHN BLANCHON, deceased, Appellants, v. KEL-LERSTRASS DISTILLING CORPORATION, Respondent.

Kansas City Court of Appeals, January 27, 1919.

**LANDLORD AND TENANT:** Holding over Term: Leases. Where a lessee holds over after the expiration of the term of his lease without giving notice of his desire to renew as required by the lease, and continues to pay rent and the landlord accepts it, his tenancy is upon the same terms, conditions and covenants as in the original lease and for a new term the same as the one provided in said lease.

Appeal from Jackson Circuit Court.—*Hon. Thos. B. Buckner*, Judge.

REVERSED AND REMANDED.

*John D. Wendorff* for appellants.

*Samuel Eppstein* for respondent.

TRIMBLE, J.—This action, in two counts, grows out of the relation of landlord and tenant created between John Blanchon and the defendant by a written lease in which the former leased to the latter the three story building at 526 Delaware street in Kansas City, Mo. The first count seeks to recover for damages to the elevator, plate glass and plastering of the building, injured or destroyed during the lessee's occupancy and

for the filthy condition in which the building was left by the tenant; the second count was for the rent of said building accruing from the time the tenant left until the end of the term for which the owner asserted the lessee was bound.

The case was tried by the court without a jury. On the first count, judgment was rendered for plaintiff in the sum of $15, of which $10 was for damage to the plastering and $5 was on account of the filth left in the building. On the second count, judgment was for defendant. The landlord, Blanchon, appealed. Thereafter, appellant died and the cause was revived in this court and the deceased's executors substituted in his stead.

The lease was dated March 18, 1915, and leased said building "in the present condition thereof" to the defendant "for a term of one year beginning the 1st day of April, 1915, and ending on the 31st day of March, 1916, with the privilege of renewing this lease upon the same terms and conditions hereinafter expressed: Provided, However, in order that the lessee may have the privilege of renewing this lease, it shall give notice in writing to the lessor herein of its intention so to renew said lease at least sixty (60) days before the expiration of the term hereof."

The agreed rent for the term was $600 per annum "payable in monthly installments" of $50 each on the first of each month in advance during the term. The lease further provided that the lessee should "keep said premises in good and sufficient repair and free and clear from dirt and filth" and that lessee would, at the expiration of the term of the lease, yield up the premises "in as good condition as when the same were entered upon by said lessee, loss by fire, inevitable accident, and ordinary wear and tear excepted."

At the time the defendant took possession under the lease the building was clean and the elevator had been repaired and put in condition with the exception of the packing which the landlord later replaced with new packing as soon as the new fittings had become adjusted and smooth from use.

The defendant occupied said premises paying the rent regularly in monthly installments of $50 each (depositing them in bank to the lessor's credit) from the 1st day of April, 1915, to November 1, 1916. The defendant gave no notice of intention to renew the lease sixty days before March 31, 1916, the end of the term in the lease, nor were any negotiations had or pending between the parties at that time. When that date arrived nothing was said by either party but the defendant continued to pay, and the landlord to accept, the monthly installments of rent as theretofore.

On September 12, 1916, the elevator, while in the exclusive possession and control of and being operated by defendant, broke down. Defendant notified the landlord to repair or replace it. The latter did not do so and on September 16, 1916, defendant gave written notice of its intention to terminate the tenancy on or before October 31, 1916, and moved out before November 1st after paying the installment of rent due October 1st.

It will be observed that upon the expiration of the yearly term originally provided for in the lease, the tenant, without any negotiations and without anything being said or done on either side, held over and continued to occupy the premises and pay rent as it had therefore done. The question is, what was the nature of the tenancy from and after the 31st of March, 1916? Was it a holding over under the written lease for another year on the same terms and conditions? Or did it, by reason of the mere failure of the tenant to give the sixty days' notice, become a *parol* lease which, under section 2781 Revised Statute 1909, would create a tenancy at will, but which by reason of section 7883, would be turned into a tenancy from month to month, the leased property being a building in town?

The leases dealt with in section 2781 are those "not put in writing" and those mentioned in section 7883 are leases "not made in writing." There being no negotiations of any character pending or attempted be-

tween the parties on the expiration of the original. term provided for in the lease, it is difficult to see how the tenancy from and after March 31, 1916, can be regarded as resting in any manner upon *a parol letting.* Nothing of the sort was engaged in. .The written lease provided for a renewal or extension thereof upon the same terms and conditions as before.   The courts of our State adhere to the view that there is no practical difference between the privilege of a "renewal" and an "extension," unless there is something manifesting an intention that a new lease should be executed.   [Insurance and Law Building Co. v. The National Bank of Missouri, 71 Mo. 58, 60-62; Medicus v. Altman, 199 Mo. App. 466, 469.]   There is nothing in the lease, in the case at bar, to show that a new 'lease was to be executed or that any other tenancy was in contemplation.   As there were no negotiations whatever relating to the occupancy of the property upon the expiration of the original term, there is nothing except the written lease itself to which the right to hold over can be attributed.   Hence, we think the tenancy in existence from and after April 1, 1916, the commencement of the holding over, should be regarded as a holding under the terms and privileges of the written lease.   It is true it provided for sixty days' written notice to be given by the lessee.   And while there is some disagreement among the courts of the different States, "the better view, however, seems to be that the provisions for notice to the lessor of the lessee's exercise of his privilege of renewal or extension is for the benefit of the lessor, and, therefore, if the lessee hold over without giving the required notice, the lessor may waive the requirement and his right to hold the lessee as for a renewal or extension of the term is the same as though such requirement had not been inserted in the lease."   [16 R. C. L. 896.  See, also, 24 Cyc. 1003; Lanham v. McWilliams, 64 S. E. 294; Probst v. Rochester Steam Laundry Co., 171 N. Y. 584; Bailey v. Plant, 31 N. Y. Supp. 1015; Holton v. Andrews, 151 N. C. 340; Kean v. Story and Clark Piano Co., 121 Minn. 198;

Brooklyn Dock, etc., Co. v. Bahrenberg, 120 N. Y. Supp. 205; Quinn v. Vaglinitte, 80 Vt. 434.] The lease was for one year with a provision for a renewal or extension at lessee's option for another year on the same terms. The *option* was for lessee's benefit, the *notice* was for the lessor's; and this the latter could waive, and did waive. By the mere act of holding over, the lessee elects to exercise the option for extension, and by accepting the rent the lessor waives the notice. [Jones on Landlord and Tenant, sec. 342, pp. 363-4.]

It is a "well-settled rule that when a tenant with the consent of the landlord, express or implied, holds over his term, the law implies a continuation of the original tenancy upon the same terms, conditions and covenants as in the original lease." [Lewis v. Perry, 149 Mo. 257, 267.] In this case the lease provided that, to warrant the renewals, the lessee should give three months' notice in writing of its intention to renew. It is nowhere stated that such notice was given but it is stated that rent was paid at the price stipulated in the lease and continued to be paid thereafter, and the court said: "That there was a second renewal for the next ensuing five years ending on the first day of December, 1894, so far as the appellant's interest in the premises was concerned is simply shown by the election of the lessee to continue in possession thereof, and the receipt by the appellant (lessor) of the quarterly rent therefor under the lease as before." The rule contained in the quotation hereabove made is supported by the following authorities: 18 Am. & Eng. Ency. of Law, 405; Peoples Bank v. Bennett, 159 Mo. App. 1, 5-9; Minton v. Steinhauer, 243 Mo. 51, 56; Hunt v. Bailey, 39 Mo. 259, 266; Finney v. City of St. Louis, 39 Mo. 177, 180; Curtis v. Sturgis, 64 Mo. App. 535; Insurance and Law Building Co. v. National Bank of Missouri, 5 Mo. App. 333, *Ibidem*, 71 Mo. 58.] If the law will imply that the intention of a holding-over tenant is to continue the tenancy on the same terms, then where the *only thing* authorizing the tenant to

hold over after the expiration of the original term specified in the lease *is the privilege or renewal or extension* contained therein, it would seem that the holding over should be presumed to be *in accordance with the privilege in the lease* and not that it was in violation of the tenant's duty to, otherwise, give possession. Nor should the holding over be deemed to create a new or oral letting, which the statute made a tenancy from month to month, for there is nothing upon which to predicate any thought or intention of making a new or oral letting. Of course, if at the time of the expiration of the original term specified in the lease, there were any negotiations had or pending between the parties relative to a new lease or renting, the holding over might well be regarded as merely as an agreed or oral tenancy while a new contract was being made. In such case the lessee could well be said to have manifested an intention not to hold under the privilege of renewal or extension in the old lease. True, the lessee by failing to give the required notice, would be unable to compel the lessor to grant the extension. But after the latter waives notice by accepting the rent, the obligations as to the extension become mutual. And all the authorities hold that the provision for notice to be given by the lessee is solely for the benefit of the lessor and that he waives that by the acceptance of rent. [Stone v. St. Louis Stamping Co., 155 Mass. 267, 270; McClelland v. Rush, 150 Pa. St. 57, 63.] The written lease provided for a renewal or extension on the same terms as before. There was nothing either in the lease or in the conduct of the parties to show that a holding over would not be under the renewal privilege. When the tenant holds over and the landlord accepts the installments of annual rent as before, with nothing to disclose the intention of the parties as to the holding except the pirvilege of renewal or extension, we think such intention should be referred to the only thing authorizing it, namely, the provision therefor in the written lease.

For these reasons we are of the opinion that plaintiff's refused declarations No. 1 should have been given. They declared the law to be that "if no negotiations for a new lease of the premises in question were pending between the parties to this suit at the time said lease entered into between said parties expired, on, to-wit: March 31, 1916, the continuing in possession of the premises and paying rent therefor by the defendant to the plaintiff as shown by the evidence, the relation of landlord and tenant between plaintiff and defendant continued identically as before the expiration of said written lease and for a new term of one year after the expiration of said written lease, terminating on the 31st day of March, 1917."

So ought plaintiff's refused declaration No. 2 to have been given. Said declaration was that the lease being in force under the renewal privilege, defendant was liable for the rent of the whole year from April 1, 1916, and as no rent was paid after October, 1916, defendant was liable for the rent of the year.

The court found that on September 12, 1916, the elevator "while in the exclusive and complete control, occupation and use by defendant, was broken and damages as follows:

"The cylinder of said elevator was cracked, broken and pushed out of alignment; the cross head track was broken, the cylinder stand was broken and pushed out of alignment, the operating valves were broken off, the piston rod was bent, carrier sheaves were broken, the machinery sheaves were broken and forced out of alignment, the elevator machinery was broken and torn from its foundation, and said elevator engine forced out of alignment."

The court, however, found that the breaking was caused "by ordinary use and wear and tear."

We have read the record and find no evidence whatever to show, nor any from which an inference can be drawn, that the breaking was from "ordinary use wear and tear." Plaintiff's evidence was to the effect that the elevator was put in good condition but that the

defendant allowed the bottom of the elevator pit to become filled with debris so that when the elevator came down to the ground it could not descend as far as the length of the cables would permit and as far as they were made for it to go, and hence when the cables were unwound to their full extent the elevator did not descend clear to the bottom but stopped on the debris, and this allowed the cables to slack and to come off the pulleys and out of their proper place and alignment; and this coming out of alignment is what created the powerful force sufficient to crack the steel cylinder and wreck and tear up the elevator. The defendant's evidence concedes that the wrecking of the elevator occurred suddenly on the afternoon of September 12, 1916, while it was being operated; that at the time of the wreck, the officers of the defendant were in the office and heard "a loud noise" that upon examining the elevator, the cylinder was cracked, out of place, and a lot of its parts broken. From the character of the *general wreck* that suddenly occurred, it would appear that something ususual must have happened then and of a very powerful character and different from mere general wear and tear from ordinary use. Of course, general wear might cause the gradual loosening of some part which, getting out of place and getting in the track of the elevator, might cause a general wreck of the entire apparatus. But defendant offered no testimony whatever to show that anything came loose or that the wreck arose from any such cause; and it is unquestioned that the bottom of the elevator pit was allowed to accumuate debris, etc., which kept the elevator from coming fully down and thereby caring for or taking up the slack in the cables when they were fully unwound. The fact that prior to that the elevator would slowly settle when left standing, on account of the water seeping out through the packing around the piston would not cause a general wreck and tearing up of the elevator and frame as seems to have occured. So that we say there is no substantial evidence upon which to base a finding or an inference that "ordinary wear and tear" caused the

wreck. When that is the situation, the finding cannot prevail. [In re Lankford's estate, 197 S. W. 147; Orchard v. Smith, 193 S. W. 574, 577.] At any rate, if we are correct in our view that the tenancy was under the renewal privilege in the lease, the breaking of the elevator did not absolve the defendant from the obligation to pay rent. [Kennedy v. Watts, 142 Mo. App. 103; Sedalia Planing, etc., Co. v. Swift & Co., 129 Mo. App. 471.]

We are asked to reverse and remand the cause with directions to render judgment, but manifestly we cannot do so for the reason that we cannot say what a repair of the elevator would cost or that plaintiff's evidence in regard thereto must be believed; and, besides, in another trial defendant may be able to introduce evidence from which an inference could be drawn that the wreck was caused by "ordinary wear and tear."

The judgment is reversed and the cause is remanded for a new trial. All concur.