**Marinda M. BECK and Donald R. Beck, Respondents,**

v.

**James R. STRONG and Frances Sue Strong, Appellants.**

**No. KCD 29286.**

Missouri Court of Appeals, Kansas City District.

Aug. 28, 1978.

Motion for Rehearing Denied Oct. 10, 1978.

James W. Gallaher, Jefferson City (Barry, Neff & Gallaher, Jefferson City, of counsel), for appellants.

Robert L. Hyder, Jefferson City (Hyder & McHenry, Jefferson City, of counsel), for respondents.

Before WELBORN, Special Judge, Presiding, HIGGINS, Special Judge, and PRITCHARD, J.

PRITCHARD, Judge.

The issues are whether respondents are entitled to a decree of quiet title, and damages, as was the judgment of the trial court, or whether appellants are entitled to a decree of specific performance of a contract for deed of April 19, 1960, and to a decree of continued validity of a lease, with alternative options to purchase or to continue the lease for an additional 89 years, which lease was entered into September 10, 1963.

The properties involved lie along Industrial Drive and (apparently) along Jaycee Drive in the western part of Jefferson City, Missouri. The following plat, plaintiffs' Exhibit 2, which was in evidence, may be helpful in the understanding of the area, and the transactions involved:

PLAINTIFFS
EXHIBIT 2

The contract for deed, entered into April 19, 1960, by Arthur H. Beck [who died May, 1966] and his wife, Marinda, with appellants covered, by courses and distances descrip-tion, the western portion of the property, in which Tract 1 is denominated a part, for a price of $22,500.00, payable 5 years after date, with 6% interest per annum, payable

$112.50 per month, with the whole of the principal amount being due and payable at the end of the 5 year period, at which time the sellers were to execute and deliver a warranty deed. The contract called for an option to lease the entire tract for 99 years if exercised within one year from the contract date, but that option was never exercised. The contract was never consummated within the 5 year period, appellant, James R. Strong, acknowledging that he had never paid the purchase price of $22,-500.00. He had, however, as admitted by respondents, continued to pay the $112.50 monthly interest, up to shortly before trial, which began on October 8, 1975.

These further facts, as to Tract 1, are in evidence: The Strongs entered the property, and constructed, at their expense, a building complex, which at trial housed Brady's Glass and Paint, The Drapery Place, Missouri Highway Commission Project Office, and the University of Missouri Extension Service. In these matters, Mr. Beck and Strong were engaged in some kind of very loose joint enterprise for the development of the area, which, according to Strong, was his idea "of bringing a lot of contractors into one center, and this was my purpose." Upon Tract 1, these deeds were executed: On September 11, 1964, Arthur H. and Marinda Beck executed a deed to Leonard Bauer and wife to about 60 feet fronting on Industrial Drive, and later, on March 15, 1965, executed a roadway deed to the same parties. The consideration, about $6,300.00 for these tracts, was paid to the Strongs, and Marinda, as to this transaction, testified, "Q. Why would you have paid Jim Stron_ $6,300 if you felt he owed you $22,500, why wouldn't you have credited that amount to what he owed you? A. Now, coming back to oral talk, this amount of money was supposed to be in this building, so Jim could put up that building. We were helping him out so he could get started." Also, on March 15, 1965, the Becks conveyed to William Cure 109.15 feet on Industrial Drive, Strong receiving the proceeds. [On February 7, 1966, the Becks gave Cure a correction deed as to the description of the property.] On the same date, the Becks conveyed the south triangular portion of Tract 1 to James O. Hammen and wife for a stone mason business, Strong receiving the sale proceeds for both these tracts. Then, on February 7, 1966, the Becks conveyed a tract on Industrial Drive to Eugene L. Schenewerk and wife, Strong again receiving the proceeds of the sale, this being after the contract was due on April 20, 1965. Then, on August 22, 1966, Marinda, after Arthur's death, signed the deed to Capital City Industrial Development Corporation (for the Interco building) for the area between the Hammen property and that of Bauer, Cure, Schenewerk and Strong. This deed recites that it is subject to easements of record "and rights granted to James R. and Sue Strong by an instrument dated April 19, 1960." From the sale of all these properties, the Strongs received all of the purchase money totalling $36,-800.00, and the Becks never did make any demand for any of it. Strong arranged for the sales of all the properties, and paid income tax on the amounts received by him.

A sewer district was formed on Tracts 1 and 2, and on October 1, 1970, Marinda directly paid $3,900.00 assessment on it, then accepted, on advice of counsel, Strong's note for that amount, payable with interest at $41.60 per month for 10 years. He has paid, and she has received, the monthly payments since November, 1970. Additionally, the Strongs have paid all of the taxes, insurance (and interest on loans) on all of the property of Tracts 1 and 2. Marinda acknowledged the receipt of the interest on the contract price, and that she deposited the funds and used them for household expenses.

According to Strong, in August, 1966, after Arthur died in May, he went to Marinda and told her he had finally settled the deal with the Jefferson City Development Corporation and that he thought it would be a good time to pay her off on the property. "And, of course, it was about three months after Mr. Beck had died, and Mrs. Beck was still a little upset, a little emotional, and she asked that it not be done at this time. She said that Mr. Beck had

thought very highly of me, and that she knew that he would want to leave the money in there, and that she would just prefer it this way, and my response was, 'Well, when the Gibson tract [Tract 2] comes up, then, we will talk about it then if it is all right.' And we visited, and that was the extent of that." He formally advised her that he was ready to pay her the $22,500, immediately after he had received $20,500 from the Jefferson City Development Corporation for land which was owned by the Becks. Marinda's version of this meeting was that she talked with Strong shortly after Mr. Beck's death, and he expressed his bereavement, "And he wanted to know if I needed any money, and things like that, but we didn't talk about settling up anything and, besides, I wasn't in the physical condition to make any commitment."

Donald R. Beck, son of Arthur and Marinda, being a party to the lease upon Tract 2, met with Strong a year after Arthur's death. There was had a very informal conversation in which Donald mentioned that "we had no contract on this property, and Jim said we ought to do something about it, and I agreed we ought to do something about it. I received no response." In the summer of 1969, Donald again had a conversation with Strong, saying, " 'Jim, you do not have a lease on some of the property which you are presently occupying.' " Strong disagreed with him, and there was a discussion of some length, and Donald said, "that there were options involved in these contracts which hadn't been taken up, and they might be confusing, and that I definitely felt we ought to sit down and get things straightened out. And he told me he liked things just the way they were, and proceeded to walk right out of the office." The next contact was by telephone and a request was made for a meeting that week, for which there was no response. Then, upon counsel's request, there was a meeting in September, 1974, but no resolution of the matters then occurred.

### Contract for Deed, Tract 1

■ As noted, it is admitted by appellants that they did not, by notice, exercise their right to purchase under the contract for deed within the five year period, which expired about April 20, 1965. Time being of the essence is not expressly specified in the contract. 91 C.J.S. Vendor & Purchaser § 104 g., p. 1006; *Branch v. Lee,* 159 S.W.2d 677, 680[1–4] (Mo.1942). But even if it were, it may be waived. Prior to the time for performance was due, Arthur and Marinda deeded their legal title to purchasers from the Strongs of portions of the property covered by the contract on four occasions: September 11, 1964, to the Bauers; a roadway deed to these same parties on March 15, 1965, coupled with a correction deed on February 7, 1966; on March 15, 1965, to the Hammens; and on February 7, 1966, a deed to the Schenewerks. Upon execution of the contract, the Strongs entered possession and made valuable building improvements upon the property, occupied by Brady's Glass and Paint, The Drapery Place, Missouri Highway Commission, and the University of Missouri Extension Service. Not only did the Becks execute these deeds, but they permitted the Strongs to retain the sole proceeds upon all of them, and the Strongs collected the rentals on the buildings erected by them. Then, after Mr. Beck's death, Marinda executed to the Capital City Industrial Development Corporation, a deed on August 22, 1966, to the remaining undeveloped area, again permitting the Strongs to retain the $20,500 purchase price. The Strongs, in the interim, and at all times, paid the taxes, insurance and development costs on all the property contained in the contract for deed, having only the equitable title thereto. Not only is the waiver here that of permitting the Strongs to expend money in improving Tract 1, *Rogers v. Gruber,* 351 Mo. 1033, 174 S.W.2d 830, 831[1, 2] (1943), but importantly, the Becks accepted the monthly interest payments on the purchase price, thereby treating it as due them, even up to shortly before trial. In this situation, it was incumbent upon the Becks to give the Strongs a notice of insistence upon the performance of the contract, and to give them a reasonable time to perform. This was not done.

See 92 C.J.S. Vendor & Purchaser § 256, p. 122. What has here happened is that the Becks have assented to a course of action with reference to the contract, which shows that they regarded the Strongs' rights thereunder as fully subsisting, notwithstanding the existing default in the payment of the purchase price, "[they] cannot suddenly, and without warning, declare a forfeiture, or maintain that one has automatically occurred." *Bogad v. Wachter,* 365 Mo. 426, 283 S.W.2d 609, 614[4] (1955). See also *Rice v. Griffith,* 144 S.W.2d 837, 845[12–18] (Mo.App.1940), [rev'd, other grounds, 349 Mo. 373, 161 S.W.2d 220]. Forfeitures are not favored. *Bogad,* supra; *Branch v. Lee,* supra, and that is exactly what would happen here if respondents are to prevail, to say nothing of the unjust enrichment they would enjoy if they should be permitted to retain the valuable improvements made at the Strongs' expense over these more than 10 years. The Becks have acquiesced in the Strongs' treatment of the property as their own. See 3 Pomeroy's Equity Jurisprudence, § 818, p. 250, where acquiescence as an estoppel to rights of property or of contract is discussed: "A most important application includes all cases were (sic) an owner of property, A, stands by and knowingly permits another person, B, to deal with the property as though it were his, or as though he were rightfully dealing with it, without interposing any objection, as by expending money upon it, making improvements, erecting buildings, and the like." The Becks here will be made whole by the receipt of the contract purchase price of the property, made when, as the evidence shows, it was unimproved. Under all of these facts, and under the foregoing cases and authority, there can be no other conclusion than that the trial court erroneously applied the law, and the judgment, as to Tract 1, must be reversed and the case remanded.

### Lease, Tract 2

On September 10, 1963, Arthur H., Marinda M., and Donald Beck, made a lease for a 10 year term to the Strongs on Tract 2, known as the Gibson or Dixon Discount Store. The rental was initially specified at $150.00 per month, and was to increase to $200.00 per month for the first 5 years after the Becks had provided $10,000.00 for work to be done on the premises, which money was paid. The rent was to increase $10.00 per month each 5 year period, but that increase was never demanded of or paid by the Strongs. Upon giving a 60 day written notice prior to the expiration of the first 10 year term, Strong was given the right to renew it for an additional 89 years (making a grand total of 99 years). For the additional lease period, the rent was to increase $10.00 per month each five year period. No written notice was given by Strongs to Becks of their desire to lease the property for the additional 89 years, but the Strongs continued to pay the $200.00 per month, which Marinda and Donald accepted without protest, after the expiration of the lease on September 10, 1973, up to shortly before trial.

The lease also granted to the Strongs the right to purchase the property for $43,000 upon the expiration of the original or base 10 year term by giving the notice in the same manner as required by the option to extend or renew, but the Strongs never did exercise the option to purchase by giving the written notice. The option to purchase is not in this case, therefore, and the only issue as to Tract 2 is whether the Becks, by acts, conduct and knowledge of the circumstances, waived the requirement of the lease that 60 days written notice be given by the Strongs of intention to renew the lease for the additional 89 year term.

At Vol. I, American Law of Property, § 3.86, p. 368, it is said, "Where the lease requires written notice the giving of the prescribed notice in unequivocal terms is a condition precedent to renewal of the term. As with other conditions precedent, however, the giving of written notice may be waived. When the lease states that notice of the election to renew is to be given a certain time before the end of the original period of the lease, the lessee loses his right to renew if notice is not given within that period. Equitable relief is generally refus-

ed in such cases, although it has been given in a few cases where failure to give it was not due to wilful or gross neglect, the delay was slight, *the loss to the lessor was small, and the termination of the lease would have worked a great hardship on the lessee."* [Italics added.] At 51C C.J.S., Landlord and Tenant § 62(3)(b), p. 200, it is said, "The provisions of a lease requiring notice from the lessee of an election or intention to renew or extend the term are for the benefit of the lessor and therefore the notice itself, or any other matter going to the sufficiency thereof, may be waived. A requirement of written notice may be waived by parol, and a waiver of notice may be express *or may be inferred from the conduct of the parties."* [Italics added.] The Missouri law is the same as to the option to renew being for the benefit of the lessor, and that it may be waived by him. *Pelligreen v. Century Furniture & Appliance Co.,* 524 S.W.2d 168, 171[8–10] (Mo.App. 1975), and cases cited.

According to the testimony of Strong, as early as August, 1966, the matter of deferring payment of the purchase price on Tract 1 until the Gibson lease tract was to be closed was discussed. Marinda acknowledged that money was discussed at that time. This testimony shows that there was an intention to exercise the options under the lease, either to purchase it (that option not having been exercised), or to renew the lease for an additional 89 years. In 1970, Marinda accepted a note from Strong in payment of the sewer district improvements on both Tracts 1 and 2, which note was payable in installments for 10 years, or 7 years *beyond* the date of the expiration of the lease in September, 1973. This shows the intention of the parties that the lease would be renewed after its expiration date. Importantly, the Becks were aware not only that the Gibson-Dixon Discount Store building had been erected during the term of the lease, but that about the time of its expiration, the Top Brands catalog store building was erected. [Strong testified the building was commenced in September, 1973, and he spent $118,000 plus on it, owing therefor $117,000 to the Exchange Bank, due in 1983.] In this connection, Marinda testified: "Q. Now, were you aware that in 1973 Jim Strong placed a new building on the Gibson tract, Tract No. 2 shaded in blue? A. I heard the heavy equipment moving the dirt. Q. And to your recollection was it in September of 1973? A. I don't remember that date. * * Q. Now, when you saw the Top Brands, what has now developed into the Top Brands building being erected, did you go to talk to Jim Strong? A. No. Q. Did you and Don discuss this matter? A. Among ourselves, yes. Q. *Did you allow Jim Strong to continue to put the building—improve the land and put the building on the land even after the lease in your mind had expired? A. That was his hard luck.* [Italics added.] Q. Now, did you continue to accept the rent of $200 per month through July, 1973 and through September of 1973? A. Yes. Q. And you have continued to accept that rent ever since? A. Being advised by the lawyer. Q. But you have accepted the rental checks and cashed them, is that true? A. Under the advice of the lawyer. Q. Do you recall signing any assignments to the Exchange Bank? A. Yes. Q. What effect did they have, in your estimation? A. So he was able to get a loan. Q. Did they work an extension of time, in your opinion, of the lease? A. Well, no."

Upon much less persuasive facts concerning the acts and conduct of the parties to a lease, the court in *Deane v. Mitchell,* 312 Ky. 389, 227 S.W.2d 893 (Ky.App.1950), held that a waiver of a notice to renew the lease occurred. There, Dawson leased an adjoining building, and Deane knew that Dawson would be compelled to incur considerable expense in connecting the two buildings, which was incurred. "It was understood that the two buildings were to be used as one property by Dawson in the conduct of his business, and it is unthinkable that Deane believed Dawson was leasing the second building and incurring this expense for the mere privilege of using the two buildings for the unexpired part of the first five year term, or for thirty-one days." (Page 894[1,

2]) See also, *Lingle v. Wainwright,* 215 La. 117, 39 So.2d 843 (1949), where a landlord, after having received a late notice to renew from his tenant, remained silent and accepted increased rental for almost a year, was held to have waived his right to notice of renewal in accordance with the lease provision; *Lakeside Dairies v. Gregersen,* 217 La. 510, 46 So.2d 752, 756[1, 2] (1950); and see the cases collected: Anno. 44 A.L.R.2d 1359, 1373, § 8[a] and [b]. Note also 50 Am. Jur.2d, Landlord and Tenant, § 1186, p. 73, and pocket part.

In the *Pelligreen* case, supra, page 171[8–10], it is further said, "The general rule is that a holding over by the lessee and waiver of notice by the lessor combine to exercise an option to extend a lease. The law then implies a continuation of the original tenancy upon the same terms, conditions, and covenants as provided [in] the original lease. (Citing cases)." See also *Blanchon, et al. v. Kellerstrass Distilling Corp.,* 200 Mo.App. 610, 208 S.W. 484, 486 (1919); *Lewis v. Perry,* 149 Mo. 257, 50 S.W. 821 (1899). In this state, there is no difference between an option for extension of a lease, and one for renewal thereof. *Krall v. Light,* 240 Mo. App. 480, 210 S.W.2d 739, 746[11–14] (1948).

█ In the argument portion of their brief, the Strongs request not only that this court rule that the lease has been extended, but also that the judgment be reversed and that the Becks be ordered to convey to them the land described as Tract 2 for the purchase price of $43,000. There is no evidence of any intention, gathered from the acts and conduct of the parties, that the option to purchase be exercised. Rather, the payment of rent and the acceptance thereof after expiration of the lease show only an exercise of the option to extend or renew it for an additional 89 years.

█ Under the facts here and the authority above cited and quoted, the lease must be held to have been extended, under the alternative option, for 89 years. The Becks could not sit silently by and permit the Strongs to erect valuable improvements which otherwise would be lost to them at great hardship, and with an unjust enrichment to the Becks. The Becks will not have been harmed by this ruling—they will have received what was originally bargained for. The equities are on the Strongs' side, and equity will intervene to relieve them of any forfeiture because the enforcement of the notice provision would be unconscionable and result in hardship. 50 Am.Jur.2d, Landlord and Tenant, §§ 1187, 1188, pp. 75, 76; Anno. 44 A.L.R.2d 1359, 1365, § 2.

Inasmuch as relief is to be granted the Strongs, it was error to grant the Becks $56,362.64 judgment under their prayer for accounting. It is true that the Becks accepted only $200.00 per month rent for the periods after the first five years to the date of trial, but there is no evidence, other than that, that they waived payment of the additional amounts. Nor is the recovery of the additional monthly rent due barred by limitation. §§ 516.100, 516.160, RSMo 1969; *Haycraft v. Haycraft,* 154 S.W.2d 617, 620[4] (Mo.App.1941). Upon remand, the additional rental due should be computed and paid by the Strongs.

The judgment upon Count I is reversed and the case is remanded with directions to enter a decree of specific performance to appellants upon their payment of the amounts due under the contract for deed as to Tract 1. The judgment upon Count I as to the lease upon Tract 2 is reversed and the case is remanded with directions that a decree be entered that the lease thereon, dated September 10, 1963, is extended for 89 years after September 10, 1973, upon the terms and conditions specified in the lease. The money judgment upon Count II is reversed except that the additional rental amounts shall be computed and a new judgment entered thereon for respondents and against appellants.

All concur.