Rae A. BLOCK, et al., Appellants,

v.

NORTH AMERICAN SAVINGS BANK, F.S.B., Respondent.

No. WD 59254.

Missouri Court of Appeals, Western District.

Nov. 6, 2001.

Greg T. Spies, Kansas City, for Appellant.

Stephen J. Owens, Co–Counsel, Kansas City, for Respondent.

Before SPINDEN, C.J., SMART and HARDWICK, J.J.

LISA WHITE HARDWICK, Judge.

Rae Block and Broadway Plaza Partners filed a declaratory judgment action against North American Savings Bank, seeking interpretation of loan-related oral and written agreements. In the same action, North American Savings Bank counterclaimed against Rae Block on an assigned promissory note and sought summary judgment on all claims in the lawsuit. The trial court granted summary judgment in favor of North American Savings Bank. Rae Block and Broadway Plaza Partners appeal, claiming that summary judgment was improper because there were material factual disputes regarding interpretation of the agreements and the parties' intentions.

We reverse the summary judgment and remand for trial.

## Facts and Procedural Background

In 1985, Broadway Plaza Partners (BPP), sought to develop real estate it owned in Lenexa, Kansas, into a shopping center. The City of Lenexa (City) agreed to finance the project with industrial revenue bonds. In the bond transaction, the City became the owner of the property and leased it back to BPP. The City used lease payments from BPP to make payments on the bonds.

North American Savings Bank (NASB) provided security for BPP's lease payments by issuing a letter of credit in favor of the City's bond trustees. As collateral

for its letter of credit, NASB obtained a promissory note from BPP, a leasehold mortgage on the property, a reimbursement agreement from each BPP partner, and a personal guaranty from each BPP partner and his or her spouse. This collateral agreement is referred to as the "BPP Loan."

A partnership dispute later arose between two of BPP's partners, James Grier and James Block. They negotiated with one another and with David Hancock, Chief Executive Officer of NASB, to divest Grier's interest in the partnership and release him from the guaranty of the BPP Loan. Ultimately, Grier agreed to transfer his BPP interest to James Block if NASB released him from the BPP Loan. Grier offered to give NASB $100,000.00 cash and transfer a $100,000.00 promissory note, which Grier held from James Block ("Block Note"), as additional security in exchange for his release from the BPP Loan. Hancock verbally agreed to accept the cash and Block Note as consideration for the release, but he did not respond to Grier's offer to use these items as security on the BPP Loan.

On October 21, 1992, David Hancock sent a letter to James Block confirming the concluded negotiations on the terms of Griers' release from the BPP Loan. The letter provided, in relevant part:

Dear Jim:

I believe the following represents our agreement this morning of the various issues regarding Broadway Plaza:

1. *Jim Grier's Exit:* David Frensley has sent the necessary release and transfer documents that will remove Mr. Grier from your Partnership and release him from any liability. He is sending to me $100,000.00 and a note signed by you (also $100,000.00) in consideration of the release of liability. I will keep the $100,000 .00 cash (less the amount used

as described below) as additional collateral for your loan. You will be credited with the interest earned, and this money can be used as part of the payoff when you refinance the loan. *The note will be given to you if you achieve a refinancing of this loan prior to 1995 with an institution other than North American Savings.* [emphasis added]

On November 27, 1992, NASB and Grier executed a Release Agreement. James Block and his wife, Rae Block, were not parties to the Release Agreement, but they signed the document to indicate their approval and consent to the terms of Grier's departure. The Release Agreement provides, in relevant part:

WHEREAS, NASB has agreed to release JAMES E. GRIER and VIRGINIA GRIER from performance of the obligations provided in the Promissory Note and Leasehold Mortgage and Security Agreement described above, and JAMES E. GRIER and VIRGINIA GRIER's performance of their obligation under the Guaranty described above, in consideration of the payment of $100,000.00 to NASB to be applied on the principal of said Promissory Note and the transfer and endorsement to NASB of that certain Promissory Note dated December 31, 1990, executed by JAMES H. BLOCK and RAE BLOCK (hereinafter the "Block Note"), a copy of which is attached hereto as EXHIBIT "A".

NOW THEREFORE, in consideration of the premises, the covenants and agreements herein contained, and the sum of ONE HUNDRED THOUSAND DOLLARS ($100,000.00) in hand paid by JAMES E. GRIER and VIRGINIA GRIER to NASB to be applied to the principal of said Promissory Note, the transfer and endorsement of the Block Note to NASB, and for other good, valu-

able and sufficient consideration, the receipt and sufficiency of which is hereby acknowledged by each party.....

James Block died in July 1994, and Rae Block acquired his BPP interests and obligations. In late 1994, Rae Block and BPP began exploring refinancing of the BPP loan because the bonds that financed the shopping center were due in 1995. BPP decided not to refinance the loan with another institution when NASB agreed to restructure the loan itself at no fee. The Block Note was not discussed by any of the parties at the time of the restructuring.

The Block Note had been executed on December 31, 1990, and was due and payable on December 31, 1995. On December 27, 1995, NASB demanded that Rae Block pay the principal amount of the Block Note plus interest. She refused, claiming the Block Note was collateral for the BPP Loan which was not in default.[1]

On October 28, 1997, Rae Block and BPP filed an Amended Petition for Declaratory Judgment in the Jackson County Circuit Court. The Petition sought a ruling that Rae Block had no liability to NASB on the Block Note or, alternatively, if the court found NASB could collect on the Block Note, that the proceeds be applied to the balance due on the BPP Loan. NASB filed a counterclaim against Rae Block seeking payment on the Block Note.

At an evidentiary hearing in August 1998, the court determined there was sufficient consideration to support the Block Note and that Rae Block was the "maker" of the Note. On September 1, 1998, NASB filed a motion for summary judgment on the remaining issues and requested the court to order Rae Block to pay NASB the principal amount of the Block Note, accrued interest and attorney's fees.

Rae Block and BPP opposed the summary judgment motion on two grounds relevant to this appeal. First, they argued that NASB had agreed to hold the Block Note as collateral on the BPP Loan, or, alternatively, to hold any proceeds from it as a principal payment against the BPP Loan. Second, they contended that any failure by BPP to refinance with another lender prior to 1995 (as referenced in the October 21, 1992 letter), was the result of NASB's inducement and agreement to restructure the BPP Loan. Thus, Rae Block and BPP argued they were dissuaded by NASB from seeking to refinance the BPP Loan with another institution.

On October 3, 2000, the trial court granted NASB's motion for summary judgment and ordered Rae Block to pay $252,826.62 for the principal and accrued interest on the Block Note, as well as NASB's attorney's fees in the amount of $90,382.20. In rendering judgment for NASB, the court found that the following facts were "undisputed:"

13. There was no agreement by NASB to hold the Block Note as collateral on the BPP Loan or to post the Block Note or proceeds as a principal payment against the BPP Loan.

... 15. The failure to refinance at a source other than NASB by the end of 1995[sic] was the result of the actions of the Plaintiffs.

## ISSUES ON APPEAL

Rae Block and BPP appeal the summary judgment, asserting six points of error: I) the trial court erred in finding as undisputed fact that there was no agreement to hold the Block Note as collateral; II) the trial court erred in deciding the parties' oral agreement to hold the Block Note as additional collateral on the BPP Loan was

---

1. The restructured BPP Loan was paid off sometime before its due date of July 27, 1998.

barred by the Statute of Frauds; III) the trial court erred in deciding the parties' oral agreement to hold the Block Note as additional collateral on the BPP Loan was barred by the Credit Agreement Statute of Frauds; IV) the trial court erred in failing to consider parol evidence to determine whether NASB agreed to hold the Block Note as collateral since the Release Agreement is incomplete or ambiguous with respect to the handling of the Block Note; V) the trial court erred in finding as undisputed fact that NASB did not prevent BPP from refinancing the BPP Loan at another lending institution before the end of 1995; and VI) the trial court erred in awarding NASB the full amount of attorney's fees incurred in this lawsuit. We address herein Points I, IV and V, as our reversal on these issues is dispositive of the case on appeal.

### Standard of Review

Rule 74.04(c)(3)[2] permits a trial court to enter summary judgment as a matter of law on any claim where there is "no genuine issue as to any material fact." A "genuine issue" exists where the record contains competent evidence that indicates two plausible, but contradictory, accounts of the essential facts. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 382 (Mo. banc 1993). The movant bears the burden of establishing his right to judgment on the record submitted. *Carlton v. Phillips*, 926 S.W.2d 8, 10 (Mo.App. W.D.1996). The evidence and all reasonable inferences must be viewed in a light most favorable to the non-movant. *Id.* at 10–11.

An appellate court reviews a summary judgment *de novo*. *ITT*, 854 S.W.2d at 376. The criteria on appeal for testing the propriety of summary judg-

ment are the same as those which the trial court should have applied under Rule 74.04(c)(3). *Id.* As the trial court's judgment should be based on the record and the law, there is no need for an appellate court to defer to the trial court's order granting summary judgment. *Id.*

### Analysis

The linchpin of the trial court's summary judgment decision was its "undisputed" finding in paragraph 13 that:

> There was no agreement by NASB to hold the Block Note as collateral on the BPP Loan or to post the Block Note or proceeds as a principal payment against the BPP Loan.

Our review of the record indicates that Rae Block and BPP presented competent and substantial evidence to dispute this finding. Summary judgment was therefore improper pursuant to Rule 74.04(c)(3).

Our review focuses on the trial court's interpretation of the two written agreements in this case: 1) the October 21, 1992 letter from David Hancock to James Block, and 2) the November 27, 1992 Release Agreement between NASB and Jim Grier. We decline Appellant's request to review the facts showing an oral agreement existed between Grier and Hancock (i.e., NASB) regarding the terms of Grier's release from the BPP Loan. The trial court properly concluded that any such oral agreement was barred by the Credit Agreement Statute of Frauds, Section 432.045 RSMo.

In the October 21, 1992 letter agreement, Hancock promised James Block that NASB would release Grier from the BPP Loan upon Grier's payment of $100,000.00

---

**2.** All rule references are to the Missouri Rules of Civil Procedure (2001) unless otherwise noted.

cash, to be used as additional collateral for the BPP Loan. The letter further conditioned the release upon Grier's transfer to NASB of the $100,000.00 Block Note, and Hancock stated that the Note would be returned to James Block if BPP "achieve[d] a refinancing of [the BPP] loan prior to 1995 with an institution other than North American Savings." James Block assented to the terms of the letter agreement by signing documents removing Grier as a BPP partner and by giving his written approval and consent on the subsequent Release Agreement between NASB and Grier.

Appellants argue that Hancock's promise to "return" the Block Note upon refinancing of the BPP Loan is evidence that NASB was holding the Note as collateral. Respondent NASB argues that Hancock's statement in the letter was intended merely as an incentive to encourage BPP to refinance the BPP Loan at another institution. NASB contends that it received the Block Note from Grier, in effect, as a $100,000.00 fee for Grier's release from the BPP Loan, and that NASB was willing to waive its right to keep that fee if BPP refinanced the loan elsewhere.

The arguments of both Appellants and Respondent are plausible in light of the vague language of the letter agreement. The October 21, 1992 letter agreement makes no specific reference as to whether the Block Note would serve as "collateral" or security for the BPP Loan, but Hancock's promise to return the Note (if certain conditions are met) may be reasonably construed to reach that result. The subsequent Release Agreement between NASB and Grier brings no greater clarity to this issue. The Release states that Grier will transfer the Block Note to NASB, but does not state what NASB will do with the Note. Neither the letter nor release agreement provide a clear indication as to whether NASB was to hold the Block Note as collateral for the BPP Loan or retain it as a fee for Grier's release.

 The plausibility of dual and conflicting interpretations gives rise to a legal ambiguity in the letter agreement. An ambiguity occurs when there is duplicity, indistinctness or uncertainty in the meaning of the words of a contract. *Alack v. Vic Tanny Int'l of Mo., Inc.*, 923 S.W.2d 330, 337 (Mo. banc 1996). An agreement is considered ambiguous if its language creates doubt or uncertainty, such that it is fairly susceptible of two interpretations. *Nixon v. Life Investors Ins. Co. of Am.*, 675 S.W.2d 676, 679 (Mo.App. W.D.1984).

 A trial court should determine, as a matter of law, whether a contract is ambiguous and, therefore, requires extrinsic evidence to aid in its interpretation. *Md. Cas. Co. v. Martinez*, 812 S.W.2d 876, 880 (Mo.App. W.D.1991). If a contract is ambiguous, a question of fact exists as to the parties' intent and summary judgment is inappropriate. *Tuttle v. Muenks*, 21 S.W.3d 6, 9 (Mo.App. W.D.2000).

 We conclude that the October 21, 1992 letter agreement between Hancock and James Block is ambiguous as to whether NASB was entitled to hold the Block Note as security for the BPP Loan or retain the proceeds of the Note as a $100,000.00 fee for Grier's release from the Loan. Parol evidence is therefore necessary to determine the parties' intentions. *Moore v. Bentrup*, 840 S.W.2d 295, 298 (Mo.App. E.D.1992). The trial court erred in finding "there was no agreement by NASB to hold the Block Note as collateral" because this was a disputed issue unresolved by the specific terms of either the letter agreement or Release Agreement. Resolution of this ambiguity will require consideration of the negotiations between Hancock, Grier and James Block that resulted in the subsequent written agree-

ments.[3] Given the available deposition testimony of Hancock that Grier offered the Block Note as "security" for the BPP Loan, this parol evidence will create additional factual disputes that further preclude summary judgment on the key issue in this case. *See Id.*

 The trial court also erred in finding no factual dispute that "[t]he failure to refinance at a source other than NASB by the end of 1995[sic] was the result of the actions of the Plaintiffs."[4] In response to the summary judgment motion, BPP presented evidence that NASB offered to do a "no fee" refinancing of the BPP Loan and arguably dissuaded the partnership from refinancing with another institution. This evidence created a factual dispute as to the reason that BPP did not refinance its loan with another financial institution. The dispute is material because it could determine whether NASB can enforce the terms of Hancock's letter. If BPP can establish that its failure to refinance elsewhere was induced by NASB and that NASB thereby hindered fulfillment of this condition precedent to return of the Block Note, NASB should not benefit from BPP's non-performance. *Hillis v. Blanchard*, 433 S.W.2d 276, 279 (Mo. banc 1968); *Ken Cucchi Const., Inc. v. O'Keefe*, 973 S.W.2d 520, 526 (Mo.App. E.D.1998).

The existence of material factual disputes render summary judgment inappropriate in this case. The trial court was premature in determining as "fact" that there was no agreement to hold the Block

Note as collateral, and that the failure to refinance at a source other than NASB was the result of the actions of the Plaintiffs. A jury must determine those facts by considering the intentions of the parties and the circumstances surrounding their agreements. *Tuttle*, 21 S.W.3d at 9. The summary judgment in favor of NASB is reversed and the case is remanded for trial.

All concur.

---

**3.** We noted, *supra*, that any oral agreement arising from these negotiations is barred from enforcement by the Credit Agreement Statute of Frauds, Section 432.045. Nonetheless, testimony regarding these negotiations is admissible as parol evidence to resolve ambiguities in the subsequent written agreements.

**4.** The October 21, 1992 letter agreement states that the Block Note would be returned to James Block if the BPP Loan was refi-

nanced "prior to 1995." It is unclear whether the trial court's reference to "by the end of 1995" was a mistake or an intentional finding based on NASB's argument that the refinancing deadline was the end of 1995 and that Hancock's letter incorrectly stated the deadline. In any event, the refinancing deadline appears to have been an additional issue of factual dispute, although not material for purposes of summary judgment.