GRAND INVESTMENT CORPORATION, Appellant,

v.

CONNAUGHTON, BOYD & KENTER, P.C., Respondent.

No. WD 61178.

Missouri Court of Appeals, Western District.

Aug. 5, 2003.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 30, 2003.

Application for Transfer Denied Nov. 25, 2003.

Paul D. Sinclair, Kansas City, MO, for appellant.

Robert O. Jester, Kansas City, MO, for respondent.

Before SPINDEN, P.J., BRECKENRIDGE and Smart, JJ.

PATRICIA BRECKENRIDGE, Judge.

Grand Investment Corporation appeals the trial court's grant of summary judgment in favor of Connaughton, Boyd & Kenter, P.C. (CBK), John Boyd, and Jerry Kenter on its petition for expense escalation rent, holdover rent, and attorneys' fees. Grand Investment raises four points on appeal. In its first point, Grand Investment claims that the trial court erred in granting summary judgment because the court erred in finding, as a matter of law, that CBK did not exercise its second one-year option under the lease. In its second and third points, Grand Investment asserts that the trial court erred in granting summary judgment on its claims against CBK for holdover rent, escalation rent, and attorneys' fees, because there are disputed issues of material fact. It further claims, in its fourth point, that there are also disputed issues of material fact precluding summary judgment on whether Mr. Boyd and Mr. Kenter are liable as guarantors under the lease. This court finds that the trial court erred in entering summary judgment because the undisputed facts show that, as a matter of law, CBK exercised its second one-year option under the lease on November 1, 1996. Additionally, this court finds that summary judgment is inappropriate on Grand Investment's claims against CBK for holdover rent, escalation rent, and attorney fees and against Mr. Boyd and Mr. Kenter as guarantors because there are disputed issue of material facts regarding the conditions under which CBK remained on the premises after November 1, 1997, whether CBK owes escalation rent under the lease from January 1, 1994, to June 29, 1998,

and whether Mr. Boyd and Mr. Kenter are liable as guarantors under the lease. Accordingly, the judgment is reversed and remanded.

**Factual and Procedural Background**

When reviewing the grant of summary judgment, this court reviews the record, and any reasonable inferences from the record, "in the light most favorable to the party against whom judgment was entered." *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). On September 4, 1992, CBK entered into an office lease with Mercantile Bank of Kansas City for 1805 Grand, Suite 600, Kansas City at the rent of $5,598 per month. The lease provided for an original three-year term from November 1, 1992, to November 1, 1995. The lease also contained two successive one-year options to extend the lease under the same terms and conditions. To exercise these options, the lease required that CBK send written notice to the landlord three months before the expiration of the lease or the expiration of the first extended term. If CBK held over without the written consent of the landlord after the lease expired, it would be considered a tenant at sufferance and liable for double rent. In addition, at times, CBK might be liable for additional expense escalation rent. The lease stated that the landlord had the right to demand that the rent be increased each year to reimburse it for expense increases.

Mr. Boyd and Mr. Kenter guaranteed this lease pursuant to separate, identical guaranty agreements. Under these guaranty agreements, Mr. Boyd and Mr. Kenter "unconditionally guarantee[d] the full performance of each and all of the terms, covenants and conditions of said Lease to be kept and performed by said Tenant, including the payment of all rentals and

other charges to accrue thereunder." The liability of the guarantors continued "in favor of the Landlord during the full term of the Lease or until the termination thereof according to its terms, notwithstanding any modification or alteration of said Lease[.]" Each guaranty agreement also provided that "no modification, compromise, indulgence, or alteration of the Lease shall in any manner release or discharge the undersigned and the undersigned does hereby consent thereto." Each guaranty agreement stated that the giving of the guaranty was a material inducement to the landlord to enter into the lease. Finally, both the lease and the guaranty agreements provided for the payment of attorneys' fees in the event that the landlord had to sue to enforce the provisions of the lease.

CBK took possession of the premises on November 1, 1992. Grand Investment purchased the building containing the leased premises on March 15, 1994, and, as a result, became CBK's landlord. On April 27, 1995, CBK sent Grand Investment written notice of its intention to exercise its first one-year option for November 1, 1995, to October 31, 1996. After the expiration of the first option term on October 31, 1996, CBK remained in possession of the premises and continued to pay Grand Investment $5,598 per month. Grand Investment accepted the monthly payments. CBK did not send Grand Investment written notice of its intention to exercise its second one-year option.

After October 31, 1997, the last day of the second one-year option period, CBK continued in possession of the premises and began paying a monthly rent of $6,158 per month. From October 31, 1997, to the end of March 1998, CBK and Grand Investment discussed entering into a new lease. Despite their negotiations, the parties did not enter into a new lease. On March 23, 1998, Grand Investment sent CBK a letter stating that it had determined that CBK did not intend to sign a new lease and requesting that CBK vacate the premises. On June 30, 1998, CBK vacated the premises.

Subsequently, Grand Investment filed suit against CBK in the Circuit Court of Jackson County. In its first amended petition, there were six counts asserted, but Grand Investment voluntarily dismissed Counts V and VI. In Counts I, II, and III, Grand Investment sought escalation rent for January 1, 1994, to June 29, 1998, holdover rent for October 31, 1997, to June 29, 1998, and attorneys' fees due under the lease, respectively. In Count IV, it sought judgment against Mr. Boyd and Mr. Kenter as guarantors under the lease for the same amounts as in Counts I, II, and III.

After CBK filed an answer and conducted discovery, it filed a motion for summary judgment. CBK attached to its motion the deposition of Shin Kuo Lee, the president of Grand Investment, a copy of the lease, and several letters between Grand Investment and CBK. In its motion, CBK asserted that it did not exercise its second one-year option, so the original lease was not in effect after October 31, 1996. CBK also claimed in its suggestions in support of its motion that Grand Investment consented to its remaining in possession of the premises from November 1, 1997, to June 29, 1998, at the increased rent of $6,158 per month while the parties were negotiating a new lease, so the holdover rental provision was inapplicable. In addition, CBK alleged in its suggestions that Grand Investment did not notify CBK that it owed additional rent under the escalation clause for the previous years as required by the notice provisions of the lease. Because it asserted that it did not owe Grand Investment escalation rent or holdover rent, CBK maintained that in its motion that it

did not owe attorneys' fees. Mr. Boyd and Mr. Kenter filed their own motion for summary judgment, in which they alleged that since CBK was not liable for escalation rent, holdover rent, and attorneys' fees, they were not liable as guarantors, but, in any event, they were only liable for any amount accrued during the original lease term, which expired October 31, 1995.

Grand Investment filed a response to the motion for summary judgment. Grand Investment attached to its response an affidavit of Mr. Lee and additional letters between it and CBK. In its response, Grand Investment denied that CBK had not exercised its second one-year option, and averred that CBK had verbally exercised it. In addition, Grand Investment disputed CBK's allegation that the provision for double hold-over rent was inapplicable because it allowed CBK to remain on the premises after November 1, 1997, at the rent of $6,158 per month while a new lease was being negotiated. Instead, Grand Investment averred in its response that it allowed CBK to stay at the increased rent, "but only with the express understanding that this amount would constitute the monthly base rent only if a new Lease were in fact executed and that [CBK] was otherwise obligated for the double holdover rent provided for by the original Lease." Finally, it denied that CBK had not been notified of escalation expenses, and alleged that CBK had been advised in letters dated September 4, 1995, and June 12, 1998, of the additional rent due under the escalation clause of the lease. Thus, it argued in its response that summary judgment was not appropriate because there were disputed issues of material fact.

On November 13, 2001, the trial court initially overruled CBK's motion for summary judgment on Counts I, II, III, and IV of Grand Investment's petition. After it heard oral arguments, however, the trial court, on December 5, 2001, granted CBK's motion for summary judgment on Counts I, II, III, and IV.[1] In its judgment, the trial court found, as a matter of law, that CBK had not exercised its second one-year option "because the parties were negotiating a new and different lease" and "the [parties'] conduct further reveals that the parties were to continue on some other type of tenancy." The trial court found that Grand Investment "converted the tenancy of [CBK] into a month to month tenancy by consenting to the continued possession of the property after October 31, 1996." Thus, it held that Grand Investment was not entitled to holdover rent. The trial court further found that the liability of Mr. Boyd and Mr. Kenter as guarantors "ended upon the expiration of the one-year lease option since the second option was not exercised[.]" Finally, the trial court held that "since there was no written agreement to pay increased rent in effect, no escalation rent is due" and "no attorney's fees are due[.]" Grand Investment appeals this grant of summary judgment.

### Standard of Review

Appellate review of a summary judgment is essentially *de novo*. *ITT*, 854 S.W.2d at 376. This court's criteria for ascertaining the propriety of summary judgment are the same as those which a trial court uses initially. *Id.* This court does not defer to the trial court's order granting summary judgment because the

---

1. In its order, the trial court incorrectly stated that Grand Investment would be dismissing Count IV of its petition. On May 15, 2002, the trial court entered a judgment nunc pro tunc sustaining the summary judgment order on Counts I, II, III, and IV, and stating that Grand Investment had dismissed Count V of its petition.

trial court's initial judgment is based on the record submitted and amounts to a decision on a question of law. *Id.* Summary judgment is appropriate where the moving party establishes a right to judgment as a matter of law and that no genuine issue of material fact exists. *Id.* at 378.

### As a Matter of Law, CBK Exercised Second Option

In its first point, Grand Investment claims that the trial court erred in granting summary judgment for CBK because it erred in finding, as a matter of law, that CBK did not exercise its second one-year option under the lease. Specifically, it argues that there is substantial evidence to show that CBK did exercise its second option to extend or, "at a minimum," there were "disputed issues of material fact regarding whether the second Lease option was exercised."

 Under the law concerning options to extend, when a lease provides that a tenant has the option to extend the term of the lease with a written notice requirement, "the option is for the benefit of the lessee, and [the] written notice requirement is for the benefit of the lessor." *Pelligreen v. Century Furniture & Appliance Co.,* 524 S.W.2d 168, 171 (Mo.App. 1975). As such, " 'if the lessee hold[s] over without giving the required notice, the lessor may waive the requirement[.]' " *Blanchon v. Kellerstrass Distilling Corp.,* 200 Mo.App. 610, 208 S.W. 484, 485 (1919) (citations omitted). "The general rule is that a holding over by the lessee and waiver of notice by the lessor combine to exercise an option to extend a lease." *Pelligreen,* 524 S.W.2d at 171. When this occurs, "the law implies a continuation of the original tenancy upon the same terms, conditions, and covenants as in the original lease." *Lewis v. Perry,* 149 Mo. 257, 50

S.W. 821, 824 (1899). However, "this principle is qualified if there is something else present, or if something in the conduct of the parties discloses a different intention." *Pelligreen,* 524 S.W.2d at 171. "Situations may and do arise wherein the facts are so uncertain as to make it a question of fact whether or not the lessee elected to exercise an option to extend." *Id.*

In this case, the lease provided that CBK had two one-year options to extend the lease under the same terms, conditions, and covenants. The lease required that CBK send written notice of its intention to exercise its option three months before the expiration of the lease. There is no dispute that CBK exercised its first one-year option on October 31, 1995, by written notice. There is also no dispute that after the first extension of the original lease expired on October 31, 1996, CBK remained in possession of the premises, CBK continued to pay the monthly rent of $5,598, and Grand Investment accepted this rent.

 The parties dispute, however, whether CBK exercised its second-one year option on November 1, 1996, such that its tenancy continued under the same terms, conditions, and covenants of the original lease. Grand Investment and CBK agree that CBK did not send Grand Investment written notice of its intention to exercise its second option, as required by the lease. Yet, Grand Investment presented testimony of Mr. Lee in its response to summary judgment that CBK verbally exercised its second option to extend. In contrast, Mr. Boyd stated unequivocally in his affidavit in support of the motion for summary judgment that CBK did not exercise its second option. It is not necessary to resolve this factual dispute as to whether CBK expressly exercised the second option. Under the undisputed facts, when CBK held over after the

expiration of the lease and Grand Investment accepted its monthly rental payments, Grand Investment waived the writing requirement and the law implies a continuation of the original tenancy, unless there are other facts which make it "so uncertain as to make it a question of fact" as to whether CBK exercised its second one-year option. *Pelligreen*, 524 S.W.2d at 171.

The only fact CBK alleged in its motion for summary judgment that might make it uncertain as to whether it exercised the second option is a letter sent by Mr. Boyd to Grand Investment on July 15, 1996. In that letter, Mr. Boyd stated that he was trying to put together a new lease agreement. It is true that "if at the time of the expiration of the original term specified in the lease there were any negotiations had or pending between the parties relative to a new lease or renting, the holding over might well be regarded as merely an agreed or oral tenancy while a new contract was being made." *Blanchon*, 208 S.W. at 486. Here, however, the undisputed facts do not preclude the legal implication that there was a continuation of the original tenancy. Mr. Boyd's statement in the July 15, 1996, letter does not indicate that CBK did not intend to exercise its second option, because, Mr. Boyd also, in the same letter, requested an extension of time to exercise CBK's second option. As such, the letter only indicates that, in July 1996, CBK was considering whether to negotiate a new lease or exercise the option. CBK does not contend that there was ever an agreed or oral new tenancy beginning November 1, 1996.

In addition, other relevant evidence indicates there was not uncertainty as to whether CBK had exercised the second option to extend. CBK attached to its summary judgment motion a letter written by Mr. Boyd, dated June 15, 1998. In that

letter, CBK recognized an expiration date for the lease of October 31, 1997, which would be the expiration date only if CBK had exercised its second option to extend. Thus, prior to suit, CBK acted consistently with the second option having been exercised. Moreover, in its response to summary judgment, Grand Investment raised the issue that CBK, by its conduct, elected to exercise the second option to extend, and Grand Investment, by its conduct, waived the written notice requirement. Subsequent to the filing of Grand Investment's response, a hearing was held on the summary judgment motion, at which CBK had an opportunity to raise any additional facts that showed that it did not intend to exercise the second option. There is no indication in the record that it did so. In light of the behavior of the parties, the sole statement in the July 15th letter, that Mr. Boyd was trying to put together a new lease agreement, does not create such uncertainty "as to make it a question of fact whether or not the lessee elected to exercise an option to extend." *Pelligreen*, 524 S.W.2d at 171. Thus, as a matter of law, CBK exercised its second option. *Id.*

In its motion for summary judgment and on appeal, CBK relies upon *Schnucks Carrollton Corp. v. Bridgeton Health & Fitness Inc.*, 884 S.W.2d 733 (Mo.App.1994), for its argument that the undisputed facts compel the contrary conclusion that because it remained on the premises after October 31, 1996, and continued to pay rent, which Grand Investment accepted, Grand Investment converted its tenancy into a month-to-month tenancy without a written lease. In *Schnucks*, the Eastern District held that when a tenant remained in possession of the premises after the expiration of the lease, and the landlord continued to accept its monthly rental payments, the landlord converted the tenant from a tenant at sufferance into a true month-to-month tenant. *Id.* at 738–39.

The critical difference between the lease in *Schnucks* and the lease at issue here, as well as the leases at issue *Lewis, Blanchon,* and *Pelligreen,* is that the lease in *Schnucks* did not contain an option to extend the life of the lease under the same terms and conditions. *Id.* at 737. Moreover, in *Schnucks,* the parties expressly agreed that the tenant would remain on the premises as a month-to-month tenant. *Id.* Thus, unlike here, the tenant in *Schnucks* did not have the opportunity to extend the lease under the same terms and conditions and the parties expressly agreed to create a new type of tenancy after the expiration of the original lease. Accordingly, *Schnucks* does not aid CBK's assertion that the undisputed facts show it did not exercise its second one-year option.

Additionally, in its brief on appeal, CBK argues that its failure to exercise the second option in writing "shows that it was not CBK's intention at that time to do so." It is undisputed, however, that CBK remained in possession of the premises after October 31, 1996, and continued to pay the monthly rent. This court has held that "[b]y the mere act of holding over, the lessee elects to exercise the option for extension[.]" *Blanchon,* 208 S.W. at 485.

The trial court erred in finding, as a matter of law, that CBK did not exercise its second one-year option and, after October 31, 1996, CBK was a month-to-month tenant. Under the undisputed facts, CBK exercised its second option, as a matter of law, and from November 1, 1996, to October 31, 1997, CBK's tenancy was governed by the same the terms, conditions, and covenants as in the original lease. Thus, the trial court erred in granting summary judgment on this ground.

### Disputed Issues of Fact on Claim for Holdover Rent

█ In its second point, Grand Investment asserts that the trial court erred in granting summary judgment for CBK on its claim in Count II for holdover rent and its claim in Count III for attorneys' fees. Specifically, it argues that there are disputed issues of material fact regarding whether CBK was a holdover tenant from November 1, 1997, to June 29, 1998, triggering CBK's liability for double rent. In its motion for summary judgment, CBK argued that, because it did not exercise its second one-year option, the original lease containing the holdover provision expired on October 31, 1996, and, as such, it cannot be liable for holdover rent because the holdover provision was no longer in effect. Since the undisputed evidence compels the legal conclusion that CBK exercised its second one-year option on October 31, 1996, the original lease containing the holdover provision did not expire until October 31, 1997. The issue, therefore, is whether summary judgment is appropriate on Grand Investment's claim for holdover rent from November 1, 1997, to June 29, 1998.

█ Section 17 of the original lease, entitled "Holding Over," provides that, if CBK remains in possession of the premises after the expiration of the lease "without the express written consent of Landlord," it will be liable for double rent and its tenancy will be considered at sufferance. "A tenancy at sufferance is not a true estate; rather it is a wrongful occupancy by one who was initially in rightful possession of the premises." *Schnucks,* 884 S.W.2d at 738. When the landlord consents to the tenant's remaining in possession, however, "the holdover becomes a true tenant and is no longer a tenant at sufferance." *Id.* at 738–39. "If a tenant at sufferance is turned into a tenant by the landlord's consent, a new tenancy is created." *Id.* at 739. The landlord may, instead, consent to the tenant's remaining in

possession as merely a modification or amendment of the prior lease, and, in that case, the terms of the prior lease may still control. *Id.* Under the terms of this lease, if CBK held over after the expiration of the lease, Grand Investment could turn CBK from a tenant at sufferance into a true tenant by its written consent.

As this court previously determined, the second extension of the original lease between CBK and Grand Investment expired on October 31, 1997. It is undisputed that CBK remained in possession of the premises from November 1, 1997, to June 29, 1998, CBK paid $6,158 as monthly rent, and Grand Investment accepted its monthly rental payments. It is also undisputed that Grand Investment sent CBK a letter on October 31, 1997, in which it stated that it was interested in negotiating a new lease, and it was wondering "whether [CBK] would like to negotiate a new lease term or whether [it] will only be holding over until [it] locate[s] other premises." Further, Grand Investment admitted in its response to CBK's motion for summary judgment that it "waived" the holdover rent for the period beginning November 1, 1997, but that waiver "was only operative upon signing a new lease." Thus, it is undisputed that CBK had written consent from Grand Investment to remain in possession of the premises after October 31, 1997, under certain conditions, and that Grand Investment waived the holdover rent if these conditions were met. There is a dispute, however, over what those conditions were.

In its motion for summary judgment, CBK argued that Grand Investment consented to its remaining in possession of the premises after October 31, 1997, under the condition "that CBK was in the process of entering into a new written lease." CBK claimed in its motion that this condition is evidenced by the letter sent by Grand

Investment to CBK on October 31, 1997, in which Grand Investment stated that as of November 1, 1997, CBK could either enter negotiations for a new lease or become a holdover tenant subject to double rent. Additionally, CBK noted that Grand Investment's president, Mr. Lee, testified in his deposition that CBK remained in possession of the premises "on the condition that they're working out the detail language of the lease with [Grand Investment's attorney], and during that period they can stay for the amount of $6,158.00, but that is under the condition that they are *in the process* of entering a new lease." (Emphasis added.)

In contrast, Grand Investment alleged in its response to the motion for summary judgment that while it "agreed to allow [CBK] to pay the amount of $6,158.00 per month while a new Lease was being negotiated," it only allowed this "with the express understanding that this amount would constitute the monthly base rent only if a new Lease were in fact executed and that [CBK] was otherwise obligated for the double holdover rent provided by the original lease." It averred that this condition is evidenced by letters dated November 6, 1997, and February 23, 1998, in which Grand Investment stated that holdover rent would be waived if they "successfully negotiate a new lease" or "reach[ ] agreement on a new lease." Grand Investment also alleged that this condition is evidenced by its March 23, 1998, letter, wherein it stated that because "[n]egotiation of this lease has now dragged on since November, 1997, with no lease yet in place," Grand Investment was terminating CBK's tenancy. Further, it disputed that Mr. Lee's testimony indicated that the condition was that CBK and Grand Investment negotiate a new lease. Instead, it alleged that Mr. Lee's testimony showed that Grand Investment agreed to allow CBK to remain in possession of the prem-

ises at a new rental amount "only if [CBK] entered into a new Lease for the premises."

Not only do the parties dispute the meaning of the letters and Mr. Lee's statements in his deposition, but it also appears from the letters and Mr. Lee's deposition that the parties had additional discussions about entering into a new lease outside of the letters. The letters reference telephone conversations between Grand Investment's attorney and Mr. Boyd and Mr. Kenter. In addition, Mr. Lee testified that he did not personally deal with CBK, but instead that all of Grand Investment's contact with CBK was through its attorney and its property manager. Thus, because the parties' intentions as to the conditions of CBK remaining in possession of the premises are disputed, summary judgment is inappropriate on the issue of whether CBK owes holdover rent for November 1, 1997, to June 29, 1998.

Since summary judgment is inappropriate on the claim for holdover rent, it is also inappropriate on the claim for attorneys' fees. The lease states that if suit is brought for, *inter alia*, the recovery of rent due under the lease, "Tenant shall pay to Landlord all expenses incurred therefor, including reasonable attorney's fees." "If a contract provides for the payment of attorney's fees and expenses incurred in enforcement of a contract provision, the trial court must award them to the prevailing party." *Schnucks*, 884 S.W.2d at 739. As the existence of disputed facts precludes summary judgment on whether CBK is liable for holdover rent, this court cannot determine, as a matter of law, whether CBK is liable for attorneys' fees.

Therefore, the trial court's grant of summary judgment on Count II is reversed. The trial court's grant of summary judgment on Count III is also reversed on

Grand Investment's prayer for attorneys' fees incurred in pursuing the collection of holdover rent in Count II.

## Disputed Issues of Fact on Claim for Escalation Rent

In its third point, Grand Investment alleges that the trial court erred in granting summary judgment for CBK on its claims in Count I for escalation rent and Count III for attorneys' fees. Specifically, it argues that there is a disputed issue of material fact regarding whether CBK owed escalation rent under the lease from January 1, 1994, to June 29, 1998. In its motion for summary judgment, CBK argued that it did not owe Grand Investment escalation rent from November 1, 1996, to June 29, 1998, because the lease was no longer in effect during that time. It further claimed that it did not owe escalation rent for any period because Grand Investment did not provide CBK with proper notice as required by the lease.

In its motion for summary judgment, CBK argued that it was not liable for escalation rent from November 1, 1996, to June 29, 1998, because the original lease with its escalation clause was no longer in effect during that time. CBK asserted that the original lease was no longer in effect after October 31, 1996, because it did not exercise its second one-year option. As this court has previously determined, however, under the undisputed facts, CBK exercised its second option on November 1, 1996. Thus, the original lease with its escalation clause was still in effect from November 1, 1996, to October 31, 1997.

Additionally, there is a disputed issue of material fact concerning whether the original lease was still effective after the expiration of the second option term. It is undisputed that CBK remained in possession of the premises from November 1, 1997, to June 29, 1998. As previously

determined, Grand Investment consented to CBK's remaining in possession of the premises after the expiration of the lease, but only under certain, disputed conditions. The dispute over the conditions of CBK's remaining in possession does not concern only CBK's liability for holdover rent, but also whether Grand Investment converted CBK from a tenant at sufferance into a true tenant under a new tenancy during that time, or whether it simply modified or amended the original lease to extend its provisions. *Schnucks*, 884 S.W.2d at 738. While CBK asserts that the parties intended the conditions be that Grand Investment converted CBK from a holdover tenant into a true tenant after the expiration of the lease as long as the parties were negotiating a new lease, Grand Investment argues that the conditions were that CBK would remain a holdover tenant under the terms of the old lease, unless it entered into a new, written lease. Thus, because there is a dispute concerning the nature of CBK's tenancy after October 31, 1997, there is also a dispute over whether CBK continued to be bound by the escalation clause in the original written lease from November 1, 1997, to June 29, 1998. *Id.* As such, summary judgment is inappropriate on the ground that the original lease was not in effect after November 1, 1996.

CBK also argued in its motion for summary judgment that it was not liable for escalation rent because Grand Investment failed to comply with the notice requirement of the lease. To determine whether summary judgment is appropriate for CBK on this ground, this court must interpret the section of the lease that provides for escalation rent.

Contract interpretation is a question of law. *Sonoma Mgmt. Co., Inc. v. Boessen*, 70 S.W.3d 475, 479 (Mo.App. 2002). "The cardinal rule of contract interpretation is to ascertain the parties' intention and to give effect to that intention." *Id.* To determine the parties' intent, the court must look only to the contract language, unless the contract is ambiguous. *Id.* "A trial court should determine, as a matter of law, whether a contract is ambiguous and, therefore, requires extrinsic evidence to aid in its interpretation." *Block v. N. Am. Sav. Bank, F.S.B.*, 59 S.W.3d 567, 573 (Mo.App.2001). To determine whether contract language is ambiguous, the court looks at the document as a whole. *Tuttle v. Muenks*, 21 S.W.3d 6, 9 (Mo.App.2000). "If a contract is ambiguous, a question of fact exists as to the parties' intent and summary judgment is inappropriate." *Block*, 59 S.W.3d at 573.

Section 3 of the lease provides for escalation rent. Under section 3,

Tenant shall pay to Landlord, at the times hereinafter set forth, as additional rent an amount equal to the Tenant's percentage of any increase in Direct Expenses above the Base Direct Expenses.[2] On or after January 1 of each calendar year subsequent to the calendar year in which this Lease commences, Landlord will notify Tenant of (i) Landlord's estimate of the increase, if any, in Direct Expenses over Base Direct Expenses payable by Tenant for the current calendar year and (ii) the amount of any Additional Rent due from Tenant, on account of the difference between the Additional Rent paid by Tenant for the preceding calendar year and the actual Additional Rent for the preceding calendar year. Tenant shall,

**2.** The lease provides that "Base Direct Expenses" are those direct expenses for the calendar year 1993. The lease then defines the type of expenses that the "Direct Expenses" include and do not include.

upon receipt of such notice, pay to Landlord within thirty (30) days of receipt of such notice (i) a sum equal to one-twelfth (1/12) of the amount of such estimate of the increase in Direct Expenses for such current calendar year for each full or partial month elapsed from January 1 of said current calendar year to the date of receipt by Tenant of such notice and (ii) the balance of the Additional Rent due from Tenant for the preceding calendar year. Following receipt of such notice Tenant shall pay to Landlord, on the first day of each succeeding calendar month during said calendar year, one-twelfth (1/12) of the amount of such estimate of the increase in Direct Expenses for said calendar year. If Landlord's estimate of Additional Rent is more than the actual Additional Rent for any calendar year the amount of such excess paid by Tenant shall be credited against the next installments of Additional and Base Rent as they become due but no credit shall be due for any decrease in Direct Expenses below the Base Direct Expenses.

Section 3 further provides that "[n]otwithstanding that the Lease has terminated, the amount of any Additional Rent due hereunder shall be payable promptly upon receipt of a statement from Landlord, and conversely any credit due Tenant for any excess of said Additional Rent shall be promptly refunded after Landlord's calculation thereof."

In its motion for summary judgment, CBK argued that under this section, Grand Investment is required to notify it of any escalation rent it owed for the preceding year on or after January 1 of the following year. As to Grand Investment's claim for escalation rent for the year 1994, CBK admitted in its suggestions in support of its motion for summary judgment that on September 5, 1995, Grand Investment sent it written notice of expense

escalation for the year 1994. CBK, however, challenged Grand Investment's computation of the expenses and, since Grand Investment did not respond to its challenge, CBK averred in its motion that it was not liable for escalation rent for that year. As to Grand Investment's prayer for escalation rent for the years 1995 to 1998, CBK argued in its motion that since Grand Investment did not notify it of escalation expenses on or after January 1 of the following years, Grand Investment breached the lease, so CBK was not liable for escalation rent.

In contrast, Grand Investment averred in its response to the summary judgment motions that the lease "provides no time frame within which [Grand Investment] must notify defendant of the additional rent due." Instead, it argued that the lease "only provides that the notice of additional rent will be given on or after January 1st of each calendar year, but does not set a deadline for giving the notice." Thus, Grand Investment stated in its response that because it sent CBK written notice of the expense escalation amounts for 1995 to 1998 on June 12, 1998, CBK's motion for summary judgment should be denied. Additionally, Grand Investment disputed that CBK was not liable for escalation rent for the year 1994 because it sent CBK notice on September 5, 1995, and "[t]he Lease does not excuse [CBK's] payment obligation in the event [CBK] disputes the additional rent[.]"

 Section 3 is "fairly susceptible" to both CBK's and Grand Investment's interpretations. *Block*, 59 S.W.3d at 573. "An ambiguity occurs when there is duplicity, indistinctness or uncertainty in the meaning of the words of a contract." *Id.* Section 3 does state that Landlord "will" notify Tenant of any escalation rent due for the preceding year "[o]n or after January

1 of each calendar year subsequent to the calendar year in which this Lease commences." It sets out detailed provisions for how the escalation rent is to be paid in the calendar years after notice of the escalation rent is made. These provisions could be read to infer that the parties intended for the amount of escalation rent to be known and paid in the year after the increased expenses occurred. The lease, however, does not expressly set a deadline for giving notice.

In addition, section 3 states that "[n]otwithstanding that the Lease has terminated, the amount of any Additional Rent due hereunder shall be payable promptly upon receipt of a statement from Landlord[.]" This sentence could allow the landlord to give the tenant notice of any escalation rent due for any year during the tenancy after the lease expires, regardless of whether it gave the tenant any previous notice that it owed escalation rent, or it could mean that the escalation rent for the last year before termination of the lease was payable after the termination. Under the first interpretation, this sentence, in effect, nullifies the sentence and subsequent inferences that appear to require the landlord to give notice to the tenant of additional rent owed for the preceding year on or after January 1 of the following year. "If language which appears plain considered alone conflicts with other language in the contract, or if giving effect to it would render other parts of the contract a nullity, then [this court] will find the contract to be ambiguous." *Tuttle*, 21 S.W.3d at 9.

Because section 3 is susceptible to two different interpretations, i.e., that landlord must tell tenant of the escalation rent due for the preceding year in the following year or only that landlord must tell tenant some time after the preceding year that it owes escalation rent, it is

ambiguous. "An agreement is considered ambiguous if its language creates doubt or uncertainty, such that it is fairly susceptible of two interpretations." *Block*, 59 S.W.3d at 573. Because the language of section 3 of the lease is ambiguous, it requires extrinsic evidence to aid in its interpretation and a question of fact exists as to the parties' intent. *Id.* As such, summary judgment is inappropriate on Grand Investment's claim for escalation rent. *Id.* Since summary judgment is inappropriate on Grand Investment's claim for escalation rent, it is also inappropriate on its claim for attorneys' fees.

The trial court's grant of summary judgment on Count I is reversed on Grand Investment's claim for escalation rent. The trial court's grant of summary judgment on Count III is reversed on Grand Investment's prayer for attorneys' fees incurred in pursuing the collection of escalation rent.

## Disputed Issues of Fact on Guarantors' Liability

In its fourth point, Grand Investment avers that the trial court erred in granting summary judgment on its claim against the guarantors of the lease, Mr. Boyd and Mr. Kenter, for holdover rent, escalation rent, and attorneys' fees owed by CBK. Specifically, it argues that there are disputed issues of material fact regarding the extent of the liability of the guarantors under the lease. In addition, it maintains that the disputed issues of material fact regarding whether CBK is liable for holdover rent, escalation rent, and attorneys' fees create disputed issues of material fact as to the liability of the guarantors.

In their motion for summary judgment, Mr. Boyd and Mr. Kenter argued that they are not liable as guarantors under the lease because CBK is not liable for

holdover rent, escalation rent, or attorneys' fees. It is true that a guarantor is not liable under a contract if the principal is not liable. *See Stifel Estate Co. v. Cella,* 220 Mo.App. 657, 291 S.W. 515, 519 (1927). Nevertheless, as this court has found that there are disputed issues of material fact regarding whether CBK is liable for holdover rent, escalation rent, and attorneys' fees, this court cannot say, as a matter of law, that the guarantors are not also liable.

Additionally, in their motion for summary judgment, Mr. Boyd and Mr. Kenter maintained that even if CBK is liable for holdover rent, escalation rent, and attorneys' fees, they are still not liable as guarantors because the guaranty agreements did not cover any amounts accruing under the lease after October 31, 1995. In contrast, Grand Investment asserted in response that the guaranty agreements applied "to all obligations of the tenant under the Lease for the entire term of the Lease, including the extensions." To determine whether the liability of the guarantors included the extensions, this court must interpret the guaranty agreements.

▆▆▆▆▆ "The rules of construction applicable to a guaranty are the same as applied to other contracts." *Royal Banks of Mo. v. Fridkin,* 819 S.W.2d 359, 361 (Mo. banc 1991). "The terms of a guaranty are to be understood in their plain and ordinary sense, when read in light of the surrounding circumstances and the object intended to be accomplished." *Nat'l Super Mkt., Inc. v. KMSK, Inc.,* 940 S.W.2d 47, 49 (Mo.App.1997). "A guaranty may be construed together with any contemporaneously executed agreements dealing with the same subject matter as an aid in ascertaining the intention of the parties." *Id.* "However, this does not mean that those agreements constitute a single contract, and the liability of the guarantor remains primarily dependent on the guaranty agreement itself." *Jamieson–Chippewa Inv. Co., Inc. v. McClintock,* 996 S.W.2d 84, 87 (Mo.App.1999). Additionally, the guarantor's liability "is to be strictly construed according to the terms of the guaranty agreement" in the guarantor's favor and "may not be extended by implication beyond the strict letter of the obligation." *Fridkin,* 819 S.W.2d at 362.

Here, Mr. Boyd and Mr. Kenter executed identical guaranty agreements on August 27, 1992. Under the guaranty agreements, the guarantors "unconditionally guarantee[d] the full performance of each and all of the terms, covenants and conditions of said Lease to be kept and performed by said Tenant, including the payment of all rentals and other charges to accrue thereunder." The guaranty agreements provided that the guarantees:

> [S]hall continue in favor of the Landlord during the full term of the Lease or until the termination thereof according to its terms, notwithstanding any modification or alteration of said Lease entered into by and between the parties thereto, or their successors or assigns, and no modification, compromise, indulgence, or alteration of the Lease shall in any manner release or discharge the undersigned and the undersigned does hereby consent thereto.

In addition, "[a]ll terms and provisions of this Guaranty Agreement shall remain in full force and effect until the Tenant or the undersigned shall have fully and satisfactorily discharged all of its obligations to Landlord under said Lease." Paragraph 30 of the lease provides that the lease is personally guaranteed by Mr. Boyd and Mr. Kenter, and that "[w]ithout said guarantees, Landlord would not enter into this Lease Agreement." Paragraph 30 further states that "[s]aid Guaranty Agreements shall be attached hereto and made a part hereof."

It appears from the language of both the lease and the guaranty agreements that the parties intended the guaranty agreements to extend for as long as the lease was in effect. The language clearly states that the guarantors are liable "during the full term of the Lease or until the termination thereof according to its terms." While the full term of the lease is five years, the lease also includes two options to extend the lease "beyond the initial term *upon the same terms and conditions.*" One of the provisions of the lease is that Mr. Boyd and Mr. Kenter personally guarantee the lease. Additionally, the guaranty agreements clearly provide that "no modification, compromise, indulgence, or alteration of the Lease shall in any manner release or discharge the undersigned and the undersigned does hereby consent thereto." One way the parties could modify the lease would be to extend its duration, which, under this provision, would not discharge the guarantors. Moreover, the guaranty agreements state that "[a]ll the terms and provisions of this Guaranty agreement shall remain in full force and effect *until* the Tenant or the undersigned shall have *fully and satisfactorily discharged all of its or their obligations* to Landlord under said Lease." CBK would not have fully and satisfactorily discharged its obligations under the lease on October 31, 1995, if it exercised its options under the lease and remained a tenant for an additional two years. Thus, it appears from the language of the lease and the guaranty agreements that the parties intended for the liability of the guarantors to exist for the first five years of the lease and for the following two years if CBK exercised its options to extend.

In its motion for summary judgment, CBK claimed that under the holding of *Jamieson–Chippewa,* the guarantors were not liable beyond the initial five-year term of the lease. In *Jamieson–Chippewa,* the Eastern District upheld the grant of summary judgment for guarantors of a lease on the grounds that the guarantors had not guaranteed the lease beyond its original five-year term. *Id.* at 89. The lease at issue in the case was a commercial lease for a five-year term with three options to extend for additional five-year periods. *Id.* at 86. The lease was guaranteed by Dennis and Teresa McClintock, who signed the lease by the word "Guarantor." *Id.* There were no other "words of guarantee" in the lease and the lease did not refer to the guaranty agreement. *Id.* At the end of the initial five-year term, Mr. McClintock, "acting in his capacity as President of the corporate Lessee," exercised the first five-year option to extend. *Id.* The tenant then defaulted on the lease, and the landlord sued the tenant and the guarantors for breach of the lease. *Id.* The trial court granted summary judgment for the guarantors because it found that they had not guaranteed the rental payments beyond the original five-year term of the lease. *Id.* at 87.

On appeal, the Eastern District upheld the trial court's grant of summary judgment. *Id.* at 90. In its decision, the court noted that "[a] guarantor is entitled to a strict construction of his obligation in his favor; he is not obliged beyond the precise letter of his obligation; and nothing may be implied against him." *Id.* at 88. The court then noted that neither the guaranty nor the lease "expressly indicate that Guarantors are obliged to guarantee any rent payments of Lessee beyond the initial five-year lease term." *Id.* Instead, "[t]he written guaranty itself consists only of the single word 'Guarantors' next to the signature line at the end of the lease." *Id.* at 89. Thus, the court held that "[u]nder these circumstances, the 'strict letter' of the guaranty contract can reasonably be defined to encompass only that which is

*necessarily* required by the use of that single word in conjunction with the lease agreement: namely, the guarantee of rent payments during the initial five-year lease term only." *Id.* The court concluded its decision as follows:

> We hold as a matter of law that the language of a lease guaranty, or else the underlying lease agreement to which it is collateral, must expressly indicate the intention of the parties that the guaranty continue in order to hold the guarantor liable. Absent some contract language clearly expressing such an intent, the guaranty must be construed as limited to the original lease term and will not extend to a renewal term.

*Id.* at 89–90.

Unlike the language of the lease in *Jamieson–Chippewa*, however, the language of the lease and guaranty agreements at issue, here, clearly expresses an intent to extend the guaranty beyond the initial five-year term. This intent can be seen in the guaranty agreements. The guaranties provide that the guarantors shall "unconditionally guarantee[ ]" the terms and conditions of the lease "during the full term of the Lease or until the termination thereof according to its terms, notwithstanding any modification or alteration of said Lease[.]" The guaranties also state that "no modification, compromise, indulgence, or alteration of the Lease shall in any manner release or discharge the undersigned and the undersigned does hereby consent thereto." In addition, paragraph 6 of the guaranty agreements states that "the terms and provisions of the Guaranty Agreement shall remain in full force and effect until the Tenant or the undersigned shall have fully and satisfactorily discharged all of its or their obligations to Landlord." This intent is further evidenced in the lease itself. Paragraph 36 of the lease provides that if CBK exercises an option to extend the lease, it shall be "upon the same terms and conditions as those herein specified." One of those conditions is that Mr. Boyd and Mr. Kenter personally guarantee the lease. Thus, the language of both the guaranty agreements and the lease clearly express an intent to extend the liability of the guarantors beyond the initial five-year term.

Because the guaranty agreements and the lease clearly express an intent for the liability of the guarantors to extend beyond the initial five-year term, the guarantors are liable under the lease until it expires. As such, if CBK owes any holdover rent or escalation rent under the lease, the guarantors would also be liable. Finally, under the guaranty agreement, the guarantors would be liable for Grand Investment's reasonable attorneys' fees if Grand Investment prevails on any of its claim against them. Therefore, summary judgment on Grand Investment's claim against Mr. Boyd and Mr. Kenter as guarantors is inappropriate to the extent it requests holdover rent, escalation rent, and attorneys' fees.

## Conclusion

The trial court erred in entering summary judgment for CBK because it erred in finding, as a matter of law, that CBK did not exercise its second one-year option under the lease. Instead, as a matter of law, CBK did exercise its second one-year option. The trial court erred in granting summary judgment in favor of CBK on Grand Investment's claims for escalation rent, holdover rent, and attorneys' fees incurred in pursuing the collection of holdover rent and escalation rent. The trial court also erred in granting summary judgment in favor of Mr. Boyd and Mr. Kenter on Grand Investment's claims for holdover rent, escalation rent, and attor-

neys' fees against them, as guarantors of the lease.

The judgment of the trial court reversed and the cause is remanded.

All concur.